IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

DUKE ENERGY INDUSTRIAL SALES,
LLC, et al.,

          Plaintiffs,

v.                                        CIVIL ACTION NO.   5:11-cv-00092

MASSEY COAL SALES COMPANY, INC.,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Plaintiffs' Motion for Summary Judgment on Breach of Contract Claim* (Document 93) and the *Motion for Summary Judgment by Defendant Massey Coal Sales Company, Inc.* (Document 96). After careful consideration of the parties' motions, memoranda in support and in opposition, attached exhibits and the entirety of the record, the Court, for the reasons stated herein, grants *Plaintiffs' Motion for Summary Judgment on Breach of Contract Claim* and denies the *Motion for Summary Judgment by Defendant Massey Coal Sales Company, Inc.*

*I.*

Plaintiffs, Duke Energy Industrial Sales, LLC ("DEIS"), DEGS of Narrows, LLC ("DEGS-Narrows"), Duke Energy Generations Services, Inc. ("DEGS"), and Duke Energy Generations Services Holding Company, Inc., ("DEGS Holding Company") are all organized or incorporated under the laws of the State of Delaware, and each has its principal place of business in Cincinnati, Ohio. (Compl. ¶¶ 1-4.) Defendant, Massey Coal Sales Company, Inc., ("Massey") is incorporated in Virginia with its principal place of business in Richmond, Virginia. (*Id.* at ¶ 5.)

On February 9, 2011, Plaintiffs instituted this action alleging claims for breach of contract, promissory estoppel, and misrepresentation arising out of an alleged coal purchasing agreement with Massey. Plaintiffs contend DEIS had a contract with Massey to supply coal at a fixed price of fifty-four dollars ($54) per ton for calendar year 2008, but that Massey intentionally breached that agreement when coal prices began to rise. The coal subject to the alleged agreement was intended to be used by Celanese Acetate, LLC ("Celanese") to operate its power generation plant in Narrows, Virginia. Celanese is not a party to the suit. DEGS-Narrows had a contract with Celanese to procure the necessary coal to fuel the power plant, and used DEIS as a coal broker. Massey supplied coal in some manner to the Cleanse Plant for over two decades, including through DEIS and DEIS' predecessor in interest, Cinergy. (Document 94 Ex. A. Smith Dep. at 206:17-207:1)

The parties agree that there are no material issues of fact in dispute. The Court summarizes the relevant undisputed facts as follows. From 2005 through 2007, Massey supplied coal to the Celanese Plant under the terms of a Coal Supply Agreement ("2005 Agreement") that it had entered into with Cinergy, which was subsequently assigned to DEIS. (Document 94 Ex. B at D003986-988 and D003971-3988.) The original term of the 2005 Agreement was from January 1, 2005, through December 31, 2006. (*Id*. at D003971-3988.) However, on December 30, 2005, the parties executed a Letter Amendment ("2005 Letter Amendment") extending the 2005 Agreement through December 31, 2007. (*Id.* at D003971-3973.) The 2005 Letter Amendment deleted and replaced paragraph three of the original agreement as follows:

> 3). Term: January 1, 2005 through December 31, 2007. On or before October 1, 2007, Buyer and Seller shall attempt to negotiate a new Base Price to become effective on January 1, 2008 and upon agreement of a new Base Price for calendar year 2008, the Term of this Agreement shall be extended to expire December 31, 2008. Thereafter, on or before each succeeding October 1 during the Term hereof, the parties shall attempt to negotiate a revised Base Price to become effective on the January 1 of the following calendar year. *As long as Buyer and Seller agree to a revised Base Price on or before each October 1, this Agreement's term shall continue for one additional*

>    *calendar year.* If in any year Buyer and Seller fail to agree timely on or before October 1 of a respective Base Price, this Agreement shall expire on December 31 of that calendar year.

(Document 97 Ex. 13 ¶ 3) (emphasis added). The parties refer to this paragraph as the "evergreen provision." In the original 2005 Agreement, the parties agreed that "[n]o modification or amendment of this agreement shall be effective or binding unless set forth in writing signed by both parties." (Document 97 Ex. 12 ¶ 29.) The terms of this 2005 Agreement were incorporated into the 2005 Letter Amendment. (Document 97 Ex. 13 at 2.)

Pursuant to the evergreen provision, DEIS and Massey began negotiating for the 2008 calendar year. On May 23, 2007, DEIS sent a request for proposal ("RFP") to Massey for a coal supply for calendar year 2008. The RFP was sent to Massey from David Beck ("Beck"), Vice President of DEIS. On June 22, 2007, Gary Smith ("Smith"), Massey Vice President of Coal Sales, responded with a bid for 100% of the coal required for 2008 and 2009 for the Celanese Plant at the fixed price of $54.00 per net ton up to 400,000 tons. Prior to the bid, Former Massey CEO Don Blankenship ("Blankenship") and Massey Senior Management, agreed to offer the $54.00 per ton price. (Document 94 Ex. D at MCSC-000186.) On July 6, 2007, Smith emailed Beck to remind him to make a decision about the bid for the Celanese Plant. At some point thereafter, DEIS came back with a $53.00 per ton figure. On July 31, 2007, Steve Sears, Massey's President of Sales, sent a memo to Mr. Blankenship recommending that Massey take the business. (Document 94 Ex. D at MCSC001102.) On the same day, Mr. Blankenship noted that he agreed. (*Id*.) On August 14, 2007, Smith emailed Beck the following:

>    Massey Industrial Sales has not received a definite answer regarding our proposals to supply coal to your Narrows plant and we are concerned about coal availability. We cannot commit to having this coal given our current production levels and the other sales commitments we have at this point. We are very interested in securing your business, and welcome the opportunity to see if we can make the tonnage available *at the price we previously discussed*. If you elect or chose to give us this business, we

3

> would be pleased to start the process to see if we can make this coal available at the same price. We have a couple of ways to do this: 1) purchase the replacement coal for our utility contracts on the OTC market, which would free up Massey production for Duke/Cinergy and 2) is increasing our own production. Both of these options will require senior management approval and several days to confirm back to you. Dave, we place a very high value on the business the Narrows plant has provided us over many years and strongly desire to continue the long standing relationship we have enjoyed with the plant and its personnel. We want to do the right thing, but also be candid about the market dynamics affecting both our businesses in order to yield the best value for Narrows.

(Document 94 Ex. D at MCSC-000187) (emphasis added). On August 15, 2007, in response to Beck's inquiry about the $54.00 per ton price, Smith emailed Beck the following:

> In theory and in general, we are okay with the price metrics you asked about. However, *I cannot at this point confirm the $54/ton number until we get a firm or formal commitment from your side that we go forward at that price*. We want to supply the coal, but please refer to my note of last night, and realize that if we get confirmation we will need a period of finite days in order to ***get our senior management final okay/approval on how we supply the coal***. We are working it as hard as we can, but need your response as soon as possible.

(Document 94 Ex. D at MCSC-000189) (emphasis added).

In response, on August 17, 2007, Beck called Smith and verbally agreed to the $54.00 per ton price offered by Massey. (Document 94 Ex. A, Smith Dep. at 149:15-150:3.) Beck also followed up with an email that DEIS wished to stick to the fixed price for 2008. (Document 94 Ex. F at CELANESE_0003_00066886-1.) On August 17, 2007, Beck emailed Sears to inform him that he had spoken with Mr. Smith and gave him the verbal ok for 2008. (*Id.* at CELANESE_0003_00066982-1.) On August 20, 2007, Smith emailed Beck the following:

> [W]anted to confirm your message about [M]assey being selcted (sic) to supply at a fixed price for CY 08 coal to [the Plant]. [W]e are working up the details to fully supply the tonnage and will revert tomorrow. [T]hanks again for your valued business.

(Document 94 Ex. D at MCSC-000193.) On August 24, 2007, Sears sent an internal memorandum to Don Blankenship seeking to confirm he still had authorization to complete coal supply agreement. (Document 94 Ex. D at MCSC- 000196.) The Memo sets out the coal quality specifications, the

4

tonnage and the price ($54.00). Sears states "[y]ou (Blankenship) signed-off on Cinergy July 31, 2007, based on my recommendation . . . Cinergy has accepted our (subject to prior sale) offer. But, due to recent market developments, I want to check with you before we accept Cinergy or make any commitment to [other companies]." (*Id*.)  On September 11, 2007, Smith emailed Beck and stated "we are good to go on the coal supply for 08 and we can discuss during our visit the way to *memorialize* the deal by amending or creating a new CSA." (Document 97 Ex. 56) (emphasis added).

In an October 16, 2007 email to Smith, Beck stated, "[a]s we discussed *a couple of months ago* on the phone, DEIS has accepted the Massey offer of the fixed $54/ton offer for 2008 for the Narrows, VA site. Hopefully we will be able to get this wrapped up soon." (Document 97 Ex. 28) (emphasis added).  Beck also indicated that he would be coming to Richmond the following week to discuss the contract for Narrows with Sears and others from Massey. (*Id*.)  On October 26, 2007, DEIS sent Massey a draft contract. Under the 2005 Agreement, Massey was responsible for delivering the coal to the plant (FOB plant). (Document 97 Ex. 12, ¶ 8.) Under the 2008 draft agreement, DEIS was going to be responsible for delivering coal to the plant (FOB mine). (Document 14 Ex. B ¶ 4.)  This new term was included in the June 22, 2007 bid. (Document 97 Ex. 15.)  In December of 2007, DEIS and Massey entered into a one month extension to the 2005 Agreement. (Document 97 Ex. 34.)  In a signed letter from Beck to Sears, Massey and DEIS confirmed the parties' "agreement to extend the terms and conditions of the Agreement one (1) month." (*Id*.) The parties agreed to a quantity of a minimum 32,000 and a maximum of 35,000 short tons of coal at a price of $54.00 per ton for January 1, 2008 through January 31, 2008. (*Id*.)

Massey compiles Daily Sales Reports to designate the tonnage it will supply to particular customers. (Ex. D at MCSC0335122.)  Customers in the Dailey Sales Reports are labeled as "Likely," "Sold Unpriced," or "Sold Priced." (*Id*.)  By November 2007, "Cinergy Narrows"

5

(Celanese Plant) was listed in the "Sold Priced" column for 2008 at $54 per ton. (*Id.*) On some occasions the "Sold Priced" column would be accompanied by a footnote indicating that such "tons are pending contract negotiations." (Document 94 Ex. D at MCSC0335135.) No such footnote accompanied the coal for the Celanese Plant. Also, internal communications on December 20, 2007, from Massey executive Baxter Phillips and Blankenship indicated that tons, which were originally dedicated to another customer, had then been "sold to Cinergy/Narrows for $54.00 per ton." (Document 94 Ex. D at MCSC0347597.) Finally, an internal memo dated January 8, 2008, from Sears indicated that Massey had been negotiating a coal supply agreement with DEIS for the Celanese plant and that they "were basically in agreement and signed off on 380,000 tons at $54.00/ton" but also indicated that the parties had not finalized a new agreement. (Document 94 Ex. D at MCSC-000292.) The parties did not execute a new final written integrated agreement similar to the 2005 Agreement.

During the relevant time period from the middle of 2007 until the beginning of 2008, coal prices dramatically increased. On January 25, 2008, Sears sent a letter advising Beck that Massey would not be signing a contract to supply coal to DEIS for the Celanese Plant in 2008. The letter states that "[c]urrent and anticipated market conditions, with respect both to price and supply have made it unadvisable for Massey to commit itself to the proposed contract(s) with your company." (Document 97 Ex. 38.) In support of this decision, Massey cited, among other things, concerns with the availability of skilled miners, difficulty in obtaining adequate supplies, and uncertainty with possible changes in worker safety and environmental regulations. (*Id.*) Nevertheless, a couple weeks later, Massey offered to discuss supplying coal to DEIS for the Celanese Plant at a much higher price. DEIS purchased coal for the Celanese Plant from a different company for February 2008 through December 2008 at a price much higher than $54.00 per ton. Celanese was granted an arbitration

award of approximately twenty-one million dollars ($21,000,000) against DEGS-Narrows and DEGS for failing to procure coal for the Celanese Plant as required by the parties' agreement.

Plaintiffs move for summary judgment on the breach of contract claim (Count 1). (Document 93.) In support, Plaintiffs argue Massey intentionally breached a contract to supply a specified tonnage and quality of coal to DEIS at a fixed price of $54 per ton for calendar year 2008. Plaintiffs contend that there is no genuine issue of material fact that Massey entered into and breached the agreement. Thus, Plaintiffs argue they are entitled to summary judgment on the breach of contract claim and further submit that this case need only go to trial on the issue of damages.

Massey moves for summary judgment on Plaintiffs' breach of contract (Count 1), promissory estoppel (Count 2) and misrepresentation (Count 3) claims. (Document 96.) In support of summary judgment on the breach of contract claim, Massey argues "(1) there was no signed, written contract; (2) Plaintiffs have failed to satisfy the statute of frauds; and (3) there is no privity between Plaintiffs' alleged damages and the purported contract with [Massey]." (Document 96 at 1-2.) Massey argues it is entitled to summary judgment on Plaintiffs' promissory estoppel claim because such a claim is not recognized under Virginia law, which it contends governs the substantive law applicable in this case. Finally, Massey argues Plaintiffs failed to point to any material misrepresentations made by Massey or that Plaintiffs reasonably relied on such misrepresentations. The Court addresses the parties' arguments below.

## II.

The well established standard for consideration of a motion for summary judgment is that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Hunt v. Cromartie*, 526

U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 247 (1986). A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. (*Id*.) The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the nonmoving party. *North American Precast, Inc. v. General Cas. Co. of Wis.*, Civil No.02:04-1306, 2008 WL 906334, *3 (4th Cir. Mar. 31, 2008). The nonmoving party must satisfy its burden of proof by offering more than a mere "scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. If the nonmoving party fails to make a showing sufficient to establish the existence of an essential element, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. If factual issues exist that can only be resolved by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.

The Fourth Circuit Court of Appeals has noted that "[c]ontract interpretation is a subject particularly suited for summary judgment disposal." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999). At first glance, one might assume all contract interpretation issues can easily be resolved on summary judgment. However, the Fourth Circuit has also recognized that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses

genuine issues of material fact ... [and] summary judgment is inappropriate." *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir. 1996). The Fourth Circuit further lays out the analysis that must take place in this situation as follows:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible to two reasonable interpretations." *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (1965). The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. *See Jaftex Corp. v. Aetna Casualty and Surety Co.*, 617 F.2d 1062, 1063 (4th Cir. 1980). If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. *World-Wide Rights Ltd. Partnership v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir. 1992).

*Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, *1126 (4th Cir. 1993). Finally, "[o]nly an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' ... If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact." *Atalla v. Abdul-Baki*, 976 F.2d 189, 192 (4th Cir. 1992) (citations and quotations omitted).

Both Plaintiffs and Defendant make several arguments about whether the parties had a contract or a legal obligation based on the deposition and/or arbitration testimony of Smith, Beck, Blankenship and others. However, it is not their opinion that controls whether a contract existed. *See* (Document 98 at 3, 9-14, 17-18, 28; Document 95 at 4; Document 101 at 6-7, 11-12; Document 102 at 3, 8, 13.) "[O]pinion testimony that states a legal standard or draws a legal conclusion by

applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) *See, e.g.*, *U.S. v. Poulin*, 2012 WL 130753, *8 (4th Cir. 2012) ("Generally, a witness may not give 'opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts.'"). Thus, the Court does not consider these legal conclusions and opinions as dispositive of the issues.

## III.

### A. Breach of Contract Claim

#### 1. Evergreen Provision

Plaintiffs argue it is undisputed that DEIS and Massey reached an agreement on a new base price for the 2008 coal supply by September 11, 2007, thereby extending the agreement through December 31, 2008. Plaintiffs point to Gary Smith's testimony that by the end of August 2007, the parties had "beat[en] the $54 number to death" and were in full agreement on the price. (Ex. A, Smith Dep. at 156:4-156:14.) Thus, Plaintiffs argue the coal supply agreement was extended through December 31 2008, simply by interpreting the plain language of the 2005 Letter Amendment because the parties had agreed to a base price of $54.00 per short ton. (Document 95 at 15-16.) Plaintiffs contend that once Massey and DEIS agreed on price prior to October 1, 2007, the contract was extended through December 31, 2008.

In response, Massey argues the 2005 Letter Amendment required any extension, pursuant to the evergreen provision, to be in a writing signed by both parties by virtue of paragraph twenty-nine (29) of the 2005 Agreement. (Document 101 at 4.) Massey argues that DEIS knew that a single writing, signed by both parties, was needed to extend the contract. (*Id*.) Moreover, Massey argues the parties did not enter such a signed written agreement prior to the October 1, 2007 deadline. (*Id*.) In reply, Plaintiffs assert the following: (1) an agreement to price was reached prior to October 1,

2007, (2) the evergreen provision did not require the agreement on price to be in a signed writing and (3) even if the agreement had to be in a signed writing, the emails and writings were sufficient to meet the signed writing requirement. (Document 103 at 5-7.)

The Court finds there are no genuine issues of material facts that remain in dispute with respect to whether the evergreen provision in the 2005 Letter Amendment extended the 2005 Agreement through December 31, 2008. There is no ambiguity with respect to the evergreen provision.

The Court must first determine if the parties "agreed" to a price prior to the October 1, 2007 deadline. Second, the Court must determine if the 2005 Letter Amendment required any such agreement on price to be in writing and, if so, the form of writing required. Clearly, the 2005 Letter Amendment was in writing as required by paragraph twenty-nine (29) of the 2005 Agreement.

After review of the emails between the parties and all evidence of record, the Court finds DEIS and Massey had an agreement on price well before October 1, 2007. First, it is quite clear the price of $54.00 per ton remained constant from the time of the initial bid through October 1, 2007. In June of 2007, Massey offered to supply coal to DEIS for the Celanese Plant at $54.00 per ton. Massey internal documents indicate Blankenship and other Massey executives agreed and signed off on the $54.00 per ton price. On August 15, 2007, in response to Beck's inquiry about the $54.00 per ton price, Smith emailed Beck to inform him that Massey was "okay with the price metrics [he] asked about. However, [Massey] cannot at this point confirm the $54/ton number until we get a firm or formal commitment from your side that we go forward at that price." (Document 94 Ex. D at MCSC-000189.) This is the type of language inviting acceptance, at the very least, as to price. On August 17, 2007, Beck called Smith and accepted the $54.00 per ton price. Beck also followed up with an email that the Celanese Plant wished to stick to the fixed price for 2008. (Document 94 Ex. F

11

at CELANESE_0003_00066886-1.) On August 17, 2007, Beck emailed Sears to inform him that he had spoken with Mr. Smith and gave him the verbal ok for 2008. (*Id*. at CELANESE_0003_00066982-1.) On August 20, 2007, Smith emailed Beck the following:

> [W]anted to confirm your message about [M]assey being selcted (sic) to supply at a fixed price for CY 08 coal to [the Plant]. [W]e are working up the details to fully supply the tonnage and will revert tomorrow. [T]hanks again for your valued business.

(Document 94 Ex. D at MCSC-000193.) On September 11, 2007, Smith emailed Beck and stated "[W]e are *good to go on the coal supply for 08* and we can discuss during our visit the way to *memorialize* the deal by amending or creating a new CSA." (Document 97 Ex. 56) (emphasis added). At this point, the parties had not only agreed on price, but also on a maximum quantity for the coal supply. Smith's use of the word "memorialize" reveals that the parties intended to put into writing what had already been agreed to with respect to the coal supply and the price for 2008. Also, Beck's October 16, 2007 email refers to the parties reaching an agreement on price "a couple of months ago." (Document 97 Ex. 28.) Viewing the undisputed facts in a light most favorable to Massey, the Court finds the parties "agreed" to a fixed base price of $54 per ton for the calendar year 2008 prior to October 1, 2007. DEIS and Massey's email and conduct manifest an intention to be bound as to price. Although the parties clearly continued to negotiate other terms of an agreement, it is abundantly clear the base price was agreed to by both parties prior to October 1, 2007. The fact that the parties wanted to "memorialize" this agreement and/or continued to talk about additional terms in no way dilutes the offer and acceptance and the requisite "meeting of the minds" as to the base price.

Massey cannot credibly dispute the fact that the parties reached an agreement on price. Instead, Massey argues the agreement on price was required to be in a writing signed by both parties. (Document 101 at 5.) Massey goes to great lengths to argue Plaintiffs knew a writing signed by both parties was required to extend the 2005 agreement under the evergreen provision. They argue

12

"plaintiffs' interpretation of the [2005 Letter] Amendment, however, would render the Writing Requirement meaningless." (Document 102 at 5.) The Defendant also contends that "[e]xtending the [2005 Letter] Amendment for a calendar year necessarily amends and modifies that contract, because it necessarily changes the term provision of the contract. Any contrary reading defies logic." (*Id*. at 6.)

The Court finds no such writing requirement was needed. The plain language in paragraph three of the 2005 Letter Amendment requires the 2007 agreement be extended if the parties agreed on a price prior to October 1, 2007. To interpret the letter amendment as requiring a signed writing, once the parties agreed to price, would negate the obvious purpose of the evergreen provision. Clearly, these parties, who had maintained a business relationship over two decades, sought (in the 2005 Letter Amendment) to recognize this relationship, streamline and continue it for the benefit of all concerned, without further cumbersome contract negotiations. Nothing in the evergreen provision requires the parties to put the price agreement in writing, much less a signed writing. The parties agreed to a price *pursuant* to the evergreen provision. Thus, this extension was not a "modification or an amendment" which triggered the writing requirement contained in paragraph twenty-nine (29) of the original agreement.

However, even if the Court found ambiguity in the 2005 Letter Amendment with respect to the necessity of a writing as to an agreement on base price or if the Court specifically found the writing requirement was applicable to this evergreen provision, the parties' agreement, as to base price, would still survive. Paragraph 29 requires any modification or amendment to be "set forth in writing signed by both parties." This, however, does not require a "singular" writing, as argued by the Defendant. Defendant argues that during the parties' previous twenty year relationship, none of their transactions were concluded without a singular contract signed by both parties. Thus,

Defendant argues that DEIS and it "unmistakably understood that a written, and signed agreement was necessary for either party to be committed to this sale." (Document 102 at 6.) However, this is not a question about whether there was an entirely new contract (2005 Agreement) or an amendment (2005 Letter Amendment), but whether the parties agreed to a base price. The evergreen provision was not in the parties' previous agreements. Presumably, the purpose of the evergreen provision was to allow parties to extend an agreement without going through the formalities of a singular signed written amendment or new contract. Defendant argues that "[t]here are simply too many material terms and value at stake for coal supply contracts of this volume to be consummated in the casual manner suggested by Plaintiffs." (Document 102 at 6.) However, the evergreen provision was, in fact, a "casual" manner for longtime business partners to extend their contract. Therefore, even if the Court were inclined to interpret the evergreen provision to require the agreement in writing signed by both of the parties, the Court does not further interpret the writing provision to require a singular signed writing. Such an interpretation would not be reasonable in light of the simplification of contract extensions contemplated by the evergreen provision. Accordingly, the emails discussed *supra* were each clearly "signed" by both Massey and DEIS representatives sufficient to satisfy the signed writing provision if it was applicable.[1] The Defendant does not dispute that there is a sequence of signed writings, but focuses only on the argument that a singular signed writing was required.

Based on the forgoing findings, the Plaintiffs are entitled to summary judgment on the Breach of Contract claim (Count I) to the extent that the 2005 Agreement was extended through the evergreen provision. In making this finding, the Court finds it unnecessary to address Plaintiffs' argument that a new contract was formed under the U.C.C., or Massey's argument that such new agreement is

---

[1] "A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation. If a law requires a record to be in writing, an electronic record satisfies the law. If a law [or contract] requires a signature ... an electronic signature satisfies the law." Va. Code § 59.1-485 (b)-(c). Massey does not dispute that the emails were signed but rather only that the evergreen provision required a singular signed writing.

unenforceable under the statute of frauds.

### 2. Damages

Defendant argues the arbitration award granted to Celanese, which is the origin of Plaintiffs' alleged damages, was entered against DEGS and DEGS-Narrows rather than DEGS Holding Company or DEIS. (Document 98 at 29.) Further, Defendant argues that neither DEGS Holding Company nor DEIS was contractually obligated to assume the payment of damages awarded against DEGS-Narrows. (*Id.*) In sum, Massey argues DEIS was not subject to the arbitration award and, therefore, it lacks standing to sue on behalf of DEGS-Narrows, and it argues DEGS-Narrows has no standing to sue under DEIS' alleged contract with Massey. In light of the Court's finding that there is a contract between DEIS and Massey, the issue of damages is the only remaining issue for trial on the breach of contract claim. The Court finds that Massey has not met its burden of establishing that no genuine issues of material fact exists for finding DEGS and DEGS Holding Company lack privity to recover damages from the arbitration award. Accordingly, the Court holds the privity argument in abeyance until the evidence is produced at trial.

### B. *Promissory Estoppel and Misrepresentation Claims*

At this point, the Court need not make a finding as to choice of law for the promissory estoppel and misrepresentations claims because the law used in finding the existence of a contract is universal to all states with colorable choice of law claims. Choice of law issues will not preclude summary judgment where the law of the relevant jurisdictions is essentially the same. *DuSesoi v. United Ref. Co.*, 540 F. Supp. 1260, 1265 (W.D. Pa. 1982). This, however, is not the case with respect to the promissory estoppel and misrepresentation claims.

Massey moves for summary judgment on Plaintiffs' promissory estoppel claim (Count II) on

two grounds. First, Massey argues that because Virginia law applies, Plaintiffs cannot succeed on such a claim since Virginia has never recognized promissory estoppel as a cognizable cause of action. (Document 98 at 26.) The Restatement (Second) of Contracts provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90(1) (1981). Second, Massey argues that even if Virginia law does not apply, Plaintiffs did not reasonably rely on Massey's promise because "DEIS clearly expected that there would be a written contract, signed by it and [Massey], before it would consider itself or [Massey] bound to perform." (Document 98 at 26.) Therefore, Massey argues "any reliance by Plaintiffs on any statement by MCS, without a written agreement, signed by both parties, would be unreasonable." In response, Plaintiffs argue that DEIS reasonably relied on Massey's promises from August 2007 through January 2008 to supply coal by refraining from purchasing the 2008 coal supply from other suppliers. (Document 99 at 20.)

Massey acknowledges that reasonableness is generally a question to be determined by a jury, but argues this is an instance where a sophisticated business entity's reliance on an oral promise may be unreasonable as a matter of law. (Document 98 at 27 (citing *200 North Gilmor, LLC v. Capital One, Nat'l Assn.*, Civ. No. 11-03164, 2012 WL 933200, at *9 (Mar. 19, 2012) (applying Maryland law)). Massey also argues that any reliance would be unreasonable because of the non-reliance clause in the 2005 agreement and because the parties knew a written contract, not oral promises, was required. The Court is not inclined to find as a matter of law that DEIS' reliance was unreasonable. To accept Massey's argument that any reliance without a written agreement would be unreasonable would mean that Massey and DEIS could essentially never have a promissory estoppel claim. The Court finds that if the law of a forum (Ohio, West Virginia, or Kentucky) which recognizes the legal

claim of promissory estoppel is used, the parties' twenty (20) year business relationship, the evidence of DEIS's forbearance from pursuing another coal supplier for several months, and the parties agreement as to price and quantity create genuine issues of material fact for the jury to decide the reasonableness of any reliance. Therefore, Massey's motion for summary judgment on Plaintiffs' promissory estoppel claim is denied.

Massey also moves for summary judgment on Plaintiffs' misrepresentation claim. Although, again, the Court need not decide at this point which state's substantive law applies, the Court will assume for the purpose of this motion, as argued by Massey, that Virginia law applies to the misrepresentation claim. To support a misrepresentation claim under Virginia law, a Plaintiff must prove "(1) a false representation (2) of a material fact (3) made intentionally or knowingly (4) with intent to mislead (5) reasonable reliance by the party misled and (6) resulting damage to the party misled." *Western Capital Partners, LLC v. Allegiance Title & Escrow, Inc.*, 520 F. Supp. 2d 777, 782 (E.D. Va. 2007). Massey argues Plaintiffs have not identified any false representations of material fact and have not put forth any evidence that such statements were intentionally made to mislead any of the Plaintiffs. (Document 98 at 29.) Also, Massey argues that such reliance on the alleged misrepresentations would be unreasonable. (*Id*.)

In response, Plaintiffs point to at least two alleged misrepresentations to support their claim. First, Plaintiffs assert Smith's testimony about Massey's "senior management approval" scheme reveals that this scheme was deliberately formulated to have Massey customers believe that the required contract approval had been received, while "Massey intend[ed] to preserve a unilateral right to deny the enforceability of that agreement based upon purported internal procedures not communicated to the customer." (Document 99 at 20.) Second, Plaintiffs point to evidence that "Massey's *modus operandi* is to enter coal supply agreements with the intent to breach those

agreements if coal prices rise enough to justify the litigation risk." (*Id.*) In reply, Massey argues that this is "fraud by hindsight" and that DEIS understood that any statement made during the contract negotiations were subject to the Massey senior management approval caveat. (Document 102 at 16.) Plaintiffs sufficiently point to evidence from Smith's testimony which establishes genuine issues of material fact as to whether a false representation was made leading the parties to believe they were in agreement. Thus, the Court finds genuine issues of material fact remain as to whether Massey made intentionally false statements with the intent to mislead and whether the Plaintiffs' reliance was reasonable. Accordingly, Massey's motion for summary judgment on Plaintiffs' misrepresentation claim is denied.

## CONCLUSION

Based on the findings herein, the Court does hereby **ORDER** that *Plaintiffs' Motion for Summary Judgment on Breach of Contract Claim* (Document 93) be **GRANTED** and that the *Motion for Summary Judgment by Defendant Massey Coal Sales Company, Inc.* (Document 96) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: July 18, 2012

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

18